## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| MARGARET T. MMBAGA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 3:06-1073 |
| vs. ) | JUDGE ECHOLS |
| ) | MAGISTRATE BRYANT |
| ) | |
| TENNESSEE STATE UNIVERSITY, ) | |
| ) | |
| Defendant. ) | |

### AFFIDAVIT OF PLAINTIFF, MARGARET T. MMBAGA

Comes the Plaintiff and would show the court as follows:

1. I am a citizen and resident of this State and competent to make this affidavit.

2. The statements in this affidavit are based upon my personal knowledge, information and belief.

3. With respect to Defendant's Statement of Undisputed Material facts, Number 9, **(hereinafter sumf)** the established requirements were crafted by Dr. Kolison with no input from Scientists to ensure fairness.

4. With respect to Defendant's sumf, number 11, as a result of reclassification, Dr. Kolison also attained a new title of "Dean" and Dr Gawel attained "Assistant Dean" title; everybody benefited. The $5,000 annual salary increase for me was modest compared to salary increases that Drs. Kolison and Gawel received after the reclassification period.

5. With respect to Defendant's sumf, number 12, the employment terms did not change until I filed a complaint against Dr. Kolison, termination terms became "for cause" or "no cause". (See no 54 below) This set a stage for terminating me when he

1

Case 3:06-cv-01073   Document 43   Filed 10/01/07   Page 1 of 14 PageID #: 351

chooses; he is good at creating reasons that appear clean on the surface but are based on lies.

6. With respect to Defendant's sumf number 15, the application process and guidelines for qualifications were crafted by Dr. Kolison and only 10 out of 22 years of my experiences were counted; which years were counted? Most scientists had less than 10 years except me, Drs. Sauvé and Harrison. I raised these points before applying.

7. With respect to Defendant's sumf, number 17, I discussed my concerns with Dr Kolison and he encouraged me to apply while he discouraged Dr. Sauvé from applying for the rank of Professor.

8. With respect to Defendant's sumf, number 18, the so called independent panel was hand picked by Dr. Kolison with strict guidelines 'Yes" or "No" evaluation system to be followed; that takes away independence. The one who set the questions has influence on the outcome by manipulating how the questions are framed.

9. With respect to Defendant's sumf, number 19, although he was not in the panel he had direct influence on the panel and he even came back to ask for additional material. The strict guidelines of 'Yes" or "No" questions takes away independence. The one who set the questions has direct influence on the outcome depending on how the questions are framed. I believe he was monitoring the process to ensure that it was going according to plan. As he once told me: "I have to cross all my 't's and dot all my 'i's and always have plan A and plan B".

2

10. With respect to Defendant's sumf, number 21, I had 22 years experience after PhD and had been an Associate Professor since 1988 in another University. If skipping a rank within TSU was a problem, other people have joined the department from other Universities and did not start at the Assistant Professor level and move up later. Example: Dr. Kudjo Dzantour started as an Associate professor and did not have the Grantsmanship, and journal publications for the last consecutive six or ten years as was required from other scientists.

11. With respect to Defendant's sumf, number 22, I had 22 years experience after PhD and had been an Associate Professor since 1988 in another University with diverse experience in teaching, research and extension with strong grantsmanship, authorship both national and international. I did not skip any rank and have quite strong resume. Another scientist, Dr. Kudjo Dzantour started as an Associate professor, and is not counted as having skipped the Assistant Professor level. Dr. Kolison encouraged me to apply for the Professor position based on my record of performance. During the time of reclassification, Dr. Kolison was also making sexual advances to me and presumably expected me to yield to the pressure of a position that I actually qualified for. Furthermore, the criteria were deliberately excessive, Dr. Robert Harrison remained an Assistant Professor, but when he moved to another department within TSU he was given the Professor Rank.

12. With respect to Defendant's sumf, number 23, prior to 2002, there was no requirement to pay 25% of my salary and my personal judgment to enhance research capacity was accepted by Dr. Kolison because he had the opportunity to suggest that I switch the funds from capacity building to 25% salary, but he did not. Demanding the

3

support of 25% my salary retroactively was deliberately done to disqualify anybody from becoming a Professor. Dr. Kolison had been at TSU for at least four years before reclassification was done, if the 25% salary was that important he should have made that a requirement. Furthermore, paying for one Post Doc and one Research Assistant from my grants in the previous three years required a lot more than 25% of my salary. In addition when Dr. Dzantour was given the Associate Professor position he had not supported a post doc or assistant for three years. The criteria were crafted to suit Dr. Kolison's intentions and were not strictly followed. If Dr. Kolison's intentions were noble with no malice, over-performance in one area of Grantsmanship should have received credit as suggested by a reviewer. The reclassification system was used as a tool for his own gratification.

13. With respect to Defendant's sumf, number 24, the requirement was excessive. More than 10 years of my experiences were not counted and some of the years counted, I was not a fulltime researcher and some I was not even working. Even then, if all my years of experience and the required 10 years of experience were used to average my publications in peer-reviewed articles in a non-ambiguous manner, I averaged more than 3 per year and would have met the requirement.

14. With respect to Defendant's sumf, number 25, the established requirements were crafted by Dr. Kolison with no input from scientists to ensure fairness. The requirements counted only 10 out of 22 years of my experiences in academic institutions. Example, I was not a full time researcher in some of the last ten years and have 8 years of teaching experience as the primary job description that was not counted.

4

15. With respect to Defendant's sumf, number 26, the established requirements were crafted by Dr. Kolison with no input from scientists to ensure fairness. If all my years of experience and the required 10 years of experience were used in a non-ambiguous manner, I averaged more than 3 peer-reviewed articles per year and had grants that supported a Post Doc., Research Assistant and students and met the requirements in publications, and Grantsmanship if requirements and evaluation system had been fair.

16. With respect to Defendant's sumf, number 27, Dr. Kolison deliberately crafted the requirements and the "Yes and No" evaluation criteria to disqualify me for the Professor rank at the same time put pressure on me to yield to his sexual advances during appeal. The requirements for Associate Professor were 2 journal publications for six years with a total of 12 journal articles. The next Professor rank requirement of three publications per year for four years would add 12 journal articles to the individual. Thus, a total of 24 articles and ten year period would be needed to become a full Professor. I had more than 30 journal articles and 8 years of teaching experience. My achievements were a lot more than what Dr. Kolison had when he became a Professor with a total of 2 journal articles.

17. With respect to Defendant's sumf number 30, Dr. Kolison has used his position to destroy my reputation by creating and spreading lies. That takes away my ability to compete for higher ranks; University officials who do not even know me in person have false and negative information about me. This implies that Dr. Kolison indirectly influenced the decision to transfer me when it was needed.

18. With respect to Defendant's sumf, number 31, that was a flawed system, crafted by Dr. Kolison, the system intimidated Dr. Sauve and he applied for the Associate

Professor position that Kolison recommended while he encouraged me to apply for the Professor position.

19. With respect to Defendant's sumf, number 33, the evaluation criteria was flawed. Even then two out of five evaluators found that I met the criteria.

20. With respect to Defendant's sumf, number 35, on January 6, 2003, the Vice President, Dr. Bankhead told me that he followed Dr Kolison's recommendations that I be moved to Associate Professor Rank. In other words, Dr. Kolison had the power to place me in the rank he wanted and if I had cooperated in his advances, I would have gotten the rank I truly deserved from hard work. He delayed announcing the ranks to give me pressure with his advances and make me realize his role in my professional advancement.

21. With respect to Defendant's sumf, number 40, changes in criteria were to occur in October 2004, but Dr. Kolison required that July 1, 2000 to June 30, 2004 be the cutting dates and wanted dates of journal article to be specified. The cutting dates eliminated publication I had in July 2004 and January to June 2000. The requirements introduced a new criteria "an option to include all experiences since joining TSU". This option favored Dr. S. Mohamed who is a Dr. Kolison's buddy and came to TSU straight from college and had publications extracted from his PhD dissertation. There is no doubt that reclassification was used as a tool to favor or punish at will and I fell on those to be punished for reporting him on sexual harassments.

22. With respect to Defendant's sumf, number 42, the one who set the questions has influence on the outcome, depending on how the questions are framed. The artificial

6

cutting dates July 1, 2000 and January to June 30, 2004 while changes were to occur in October means that his interest was not to motivate by rewarding effort rather the reclassification was used as a tool to favor or punish at will and I fell on those to be punished for reporting him on sexual harassments.

22. With respect to Defendant's sumf, number 43, the grants I had in 2004 were exactly the same as those I had in the 2006 application. However, I met the requirement in 2006 and not in 2004 without adding any new grants or changing any fund allocations. That shows clearly that Dr. Kolison's claim influenced the evaluation while fronting the panel. He carefully monitored the evaluation and influenced the outcome through the questions he asked to be answered as a "yes or no". Two reviewers left their evaluation on grants blank, but my results sheet shows 7/7 reviewers found that I did not meet grants requirement. Where did 7 come from? It ought to have been 5/7. Unfortunately, results on grants that went on paper did not come from the reviewers suggesting reclassification were predetermined.

23. With respect to Defendant's sumf, number 44, reviewers were hand-picked by Dr. Kolison with strict guidelines 'Yes" or "No" to follow; that takes away independence. The one who set the questions has influence on the outcome depending on how the questions are framed.

24. With respect to Defendant's sumf, number 46, Dr. Kolison made an attempt to stop me from applying by putting constraints for me to prepare the application package. The photocopier was new and I had never used it and the secretary in McMinnville was also instructed not to help me in any way. Furthermore, I was the

7

only one who had to have my package in by 4:30 pm for it to be accepted, others were still photocopying their paperwork at 4:30.

25. With respect to Defendant's sumf, number 47, my reclassification was not accompanied by the 10% salary increase according to the Presidents directive. Dr. Kolison claimed there was no money but he had continued to announce new position and had funds to refurnish his office. Ironically, during the announcement of our promotion, he said that next time he will request 10% and shortly after that the President's announcement came out. Worse still, the day I was promoted, Dr. Kolison made a clear indication that the criteria can "now" be lowered. That was encouraging to other scientists, but made it clear that I was the target he wanted to keep down and since I managed to move up anyway, the rule was no longer needed. The reduced requirements were again introduced during the staff meeting of September 18, 2007. New criteria for research faculty ranks were announced and criteria are less stringent. Publications of journal or non-refereed will be lumped together, making it easy to reclassify to higher ranks especially to Professor rank.

26. With respect to Defendant's sumf, number 52, Dr. Kolison set a time table for the hiring of Mario Keri as a permanent staff, the references I had as the chair of search committee were not admitted in the discussion and Kolison did not allow time for the search committee to check references as a group. Dr. Kolison also threatened that if the hiring did not occur within the period he specified, the position would be eliminated. He also directly got involved in the hiring process by eliminating two candidates from the list of five candidates selected by the search committee for phone interview. If a candidate's name is not certified by the EEO, the applicant cannot be

8

interviewed even by phone. That intervention was worse than taking part in the discussions, it directly affected outcome.

27. With respect to Defendant's sumf, number 53, I had no choice in hiring Mr. Keri. Dr. Kolison said if there was a tie in deciding, his office would break the tie. Dr. Kolison knew there would be a tie with myself and Dr. Oliver being objective to get the best candidate for the job while Dr. Gawel and Ms. Nan Martin do whatever Kolison wants to hire Keri. The failure to check references due to time limitations and Ms. Nan Martin's refusal to admit Mario's performance in my lab or report from the previous supervisor forced the hiring. The situation was cleverly imposed on the committee.

28. With respect to Defendant's sumf, number 54, changes in my employment contract are evident in the contracts: The modifications on work contracts *(starting October 2004)* after my complaint to TSU EEO were on conditions that govern the appointment of research faculty. S*ection no 8*: 'This appointment is contingent upon **"availability of grant funding"** instead of **"availability of continued funding"** as in previous contracts of 2003 or when I joined the University. I was hired on state appropriated funds and that reason was given by the Vice President on the inability to transfer me; continued funding of state funds is very different from grant funds. The condition on **"availability of grant funding"** is used for appointments from soft money (grants) such as Post Docs. The changes also added that the agreement **may be terminated 'for cause' or no cause'.** Such changes would make it easy to justify job termination.

29. With respect to Defendant's sumf, number 55, Dr. Kolison's deceptive creativity allowed him to implicate a student on lies he created to destroy my reputation; the graduate student got distressed and left my program

30. With respect to Defendant's sumf, number 56, this is an outright lie. Dr. Kolison had to give me a book (Who Moved My Cheese) to convince me to look at other options in career development such as administration.

31. With respect to Defendant's sumf, number 58, this is absolutely false.

32. With respect to Defendant sumf, number 59, that is false. At any rate I did not know that he would inform Gawel until I received a copy of the letter. Dr. Kolison displays such supremacy over Gawel that if Dr. Kolison needed something, Dr. Gawel normally went along. Example, reducing the salary of Dr. Mrema, the hiring of Theophilus Amanenyu, Keri's hiring and extended probation. In this case, he told me that he was not asking permission, he was merely informing Gawel as my supervisor because I would travel with him-Kolison. If I requested the training as Kolison claims, it is unlikely that I had a bargaining power on whether Kolison should talk to Gawel or not. Keeping up with lies is difficult; it doesn't make sense that I would negotiate to receive training and at the same time be opposed to Dr. Kolison speaking to Dr Gawel. It does not make sense.

33. With respect to Defendant's sumf, number 60, that is false. Dr. Kolison does what he wants regardless of what I want. If I indeed requested the training from him as he claims, I would not be in a position to put my own rules that he should not inform Dr Gawel. Example: sometimes Kolison used to call me and ask that he needed Theophilus Amanenyu in Nashville in the following week without giving a

reason as to why he needed him or asking if he is in the middle of an important research project, but I simply said 'OK' without questions.

34. With respect to Defendant's sumf, number 61, Dr. Kolison wrote to Dr. Gawel to inform him that he will be sending me to a leadership training. When I saw a copy of the letter, I asked Dr. Kolison whether Dr. Gawel can refuse to approve the training and Dr. Kolison told me that he was simply informing Dr. Gawel as supervisor and was not asking for permission. He added that the training will require me to travel with him (Kolison) and would be paid from Nashville (Kolison) funds.

35. With respect to Defendant's sumf, number 65, leadership of Research teams has been by appointment. The general practice that Dr. Kolison appoint a new team leader or interim leader from the group has been the practice in all teams. Examples: In 2001 Dr. Ekanem was appointed to replace Dr. Singh as the Economics team leader; in 2005 Dr. Catanzaro was appointed an interim team leader for the Plant team replacing Dr. Sauvé and Dr. Tegegne was appointed to replace Dr. Ekanem. Recently on September 18, 2007, Dr. Gawel was appointed as an interim leader for the Plant team until a new leader gets appointed. When our team needed a new leader in 2002, the situation was treated differently and our research team was left without a leader for a long time so he can fill the position using a new job announcement at a higher salary than the salary I had. It was obvious that I would be at least an interim leader and Dr. Kolison explained to me that he was deliberately putting the team leader as a new position so that I can get a higher salary and move to Nashville.

36. With respect to Defendant's sumf, number 66, I did not ask Dr. Kolison if it would be appropriate for me to apply for the team leadership position. Dr. Kolison

announced the position to the whole team before the announcement was out and told the research team that if anybody plans to apply for the position they should let him know so they could be excluded from the search committee. There was no reason for me to ask him if it was appropriate for me to apply; the team project was formulated around my personal research since the team was initiated.

37. With response to Defendant's sumf, number 67, this is totally false.

38. With response to Defendant's sumf, number 69, Dr. Ekanem was sponsored to attend a conference in Australia more than a year before I made a request to travel to Tanzania to develop a collaborative research project. The sponsorship from Sponsored Research Program was not a problem when Dr. Ekanem was sponsored, but it became a problem when I got sponsored and a new rule was erected to restrict anybody from requesting sponsorship without Dr. Kolison's permission. Ironically, in the 2004 TSU EEO complaint, Dr. Kolison claimed that he initiated the restrictions because I had overstayed in Tanzania. At the time I pointed out that his reason was a lie and explained that the new rule was initiated in January when I was planning the trip and asked some scientists to accompany me. However, I postponed the trip until May, after the rule was already in place. That is the problem in lying, the story has now changed and a new excuse is used. When did Dr. Duseja make the request? He or Dr. Mills may be able to expose the lie even more.

39. With respect to Defendant's sumf, number 73, I was not voted out of the seminar committee; that is another big lie. Nobody has ever been voted out of any committee. The seminar committee had some members who often had excuses why their meeting

attendance was erratic, but they were not voted out. I drove 2 hours to these committees and was an active participant in all committees I have been a part of.

40. With respect to Defendant's sumf, number 74, before I was removed from all departmental committees, I had served in different committees the last of which was the Technology committee and I never missed any meeting. I asked him why he did not appoint me to any committee and he gave the excuse that was a big lie and we both knew it was a big lie, but there was nothing I could do, he was the boss. Nobody has to show anything or request to be appointed to committees except me and I did not want to provoke more problems and retributions. It is amazing that Dr. Kolison claims that I was not good enough to serve in any committee, yet be one of the most productive scientists to have risen to Professor Rank as the most senior in his department. Dr. Kolison claims that he appointed me to a Safety committee in January 2006, on what grounds? I did not make any request or show more enthusiasm than I did in 2005 when he removed me from all committees.

OATH

STATE OF TENNESSEE

COUNTY OF DAVIDSON

I hereby certify that the information contained in this affidavit is true to the best

of my knowledge, information and belief.

_Margaret B C_
Margaret Mmbaga

Notary Public: _Robin L. Burch_

Date: _9/27/07_

My commission expires: _7-25-09_