# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

MARGARET T. MMBAGA,                    )
                                       )
      Plaintiff,                  )
                                       )
    v.                              )   **NO. 3:06-1073**
                                       )   **JUDGE ECHOLS**
TENNESSEE STATE UNIVERSITY,            )
                                       )
      Defendant.                  )

## MEMORANDUM

This is a discrimination and retaliation action brought by a Research Professor, Plaintiff Margaret T. Mmbaga, against her employer, Defendant Tennessee State University ("TSU"). Defendant has filed a Motion for Summary Judgment (Docket Entry No. 34) which has been briefed by the parties.

## I. INTRODUCTORY COMMENTS

Unlike the parties, when the Court begins to consider a Motion for Summary Judgment it generally has little knowledge of the facts underlying the case, other than those presented as allegations in the Complaint. For this reason, the Court expects the parties to set forth the facts established by the evidence in a lucid and logical way, and the Court has a Local Rule to guide the parties in that endeavor.

In this case, the facts underlying the parties' dispute are difficult to articulate primarily because of Plaintiff's failure to comply with Local Rule 56.01. In accordance with that rule, Defendant filed its statement of undisputed material facts. Plaintiff filed a response in which she "denied" many of the statements made by the Defendant and cited in support her accompanying Affidavit. However, many of the "denials" are not in fact denials of the statement set forth by the

Defendant. Instead they are only Plaintiff's view of why Defendant should not have taken the action that it did. For example, Defendant states that when Plaintiff's position was reclassified in 2002, she received a $5,000 increase in her annual salary. Plaintiff "denies" this statement by indicating that "as a result of the reclassification, . . . everybody benefitted. The $5,000 annual salary increase for me was modest compared to salary increases [others received] after the reclassification period." (Pf. Aff. ¶ 4). Clearly, this is not a denial of Defendant's contention that Plaintiff received a $5,000 raise.

Another example relates to Defendant's statement of fact number 24 which indicates that a requirement for a full Research Professor is that the candidate "have at least three publications in 'peer-reviewed articles' each year for ten consecutive years." (Def. SOF ¶ 24). In "denying" this statement, Plaintiff in her Affidavit states that "the requirement was excessive. More than 10 years of my experiences were [sic] not counted and some of the years counted, I was not a fulltime researcher and some I was not even working. Even then, if all my years of experience and the required 10 years of experience were used to average my publications in peer-reviewed articles in a non-ambiguous manner, I averaged more than 3 per year and would have met the requirement." (Pf. Aff. ¶ 13). Again, this is not a denial of the fact stated by Defendant.

A final example relates to Defendant's statement that the panel which "reviewed Plaintiff's application for full Research Professor in 2002 denied the application because she did not meet the qualifications." (Def. SOF ¶ 33). Plaintiff "denies" this statement and states in response that "the evaluation criteria was flawed. Even then two out of five evaluators found that I met the criteria." (Pf. Aff. ¶ 19). Like the previous examples and with many other "denials" made by Plaintiff, this is not a denial of the fact stated by the Defendant.

2

Compounding the problem is Plaintiff's total failure to set forth, in a logical and comprehensive manner, her position as to what occurred in this case and when it occurred. Instead of stating additional facts which she believes to be relevant as allowed by Local Rule 56.01, Plaintiff simply lists some "facts" which she says are disputed in her response brief and cites pages of her deposition as support. Those deposition pages, however, were not supplied by the Plaintiff and are not in the record before the Court.

While Defendant has done a much better job in setting forth the facts, there are some deficiencies which make it difficult for the Court to analyze this case. For example, some of the "facts" upon which Defendant relies are not tied to specific dates, making analysis of Defendant's arguments relating to exhaustion of remedies problematic.[1] Additionally, some of the players are not clearly identified in Defendant's statement of facts.

Nonetheless, the Court has thoroughly reviewed the record in an effort to discern the relevant facts. The Court begins by recounting the facts set forth by the Defendant which Plaintiff does not actually deny. The Court will then quote verbatim what Plaintiff claims to be genuine issues of fact. The Court proceeds in this manner because it cannot, from the snippets provided by Plaintiff, articulate in a logical and orderly fashion what Plaintiff claims occurred in this case.

## II. FACTUAL BACKGROUND

On November 30, 1995, Plaintiff was hired by TSU as an Associate Investigator/Plant Pathologist at the McMinnville Research Station with an annual salary of $44,000. Dr. Stephen H. Kolison, Jr.("Dr. Kolison") arrived at TSU in 1998. He became Plaintiff's ultimate supervisor and

---

[1]The Court does not place all of the blame on Defendant for these deficiencies because Plaintiff's allegations are wide-ranging and cover a span of many years.

Case 3:06-cv-01073   Document 49   Filed 11/20/07   Page 3 of 30 PageID #: 393

is the Dean and Research Director for the Institute of Agricultural and Environmental Research. He has his office in Nashville.

Plaintiff was hired as a researcher in a twelve-month, non-tenure track position.[2] The research position was renewable at the end of the twelve-month term, but there was no opportunity for advancement and hence no promotion system in place for Plaintiff's position. The employment agreement which Plaintiff signed states that the agreement could be terminated upon thirty days notice.

In 2002, Dr. Kolison received approval from the Tennessee Board of Regents to reorganize some of the operations at the McMinnville Research Station. Previously, those in research positions were classified as "research staff," but with the changes, employees who qualified could be reclassified into the higher ranking position of "research faculty." With the changes, Plaintiff was reclassified from the position of Associate Investigator/Plant Pathologist to Research Assistant Professor and received a $5,000 increase in annual pay.

The position of Research Assistant Professor was also a non-tenured track position with a one-year term of employment. Employees in such positions had the opportunity to apply for reclassification to a higher position. Research positions increase in rank from Research Assistant Professor to Research Associate Professor to full Research Professor, each with their own criteria. However, none of the positions are tenure-track positions.

_____

[2]Generally, tenure-track positions are for faculty members whose primary responsibility is to teach students. It takes between four to six years to gain tenure. Employees who may have some teaching duties but are primarily engaged in research generally are not granted tenure-track positions. Plaintiff has never been in a tenure-track position while employed at TSU, nor has she ever applied for a tenure-track position.

Each position had specific guidelines for qualification and each faculty member could seek to be reclassified only once a year. Reclassification applications are sent to an independent panel to review all criteria and make a recommendation as to whether to approve or deny the candidate's request for reclassification. Dr. Kolison is not on the review panel, although Plaintiff claims he exerted influence on the panel because its members were "hand picked" by Dr. Kolison.

After being reclassified to Research Assistant Professor, Plaintiff applied directly for the position of full Research Professor in 2002. This would effectively mean that Plaintiff would skip the rank of Research Associate Professor.[3]

When Plaintiff applied for the full Research Professor position in 2002, one of the criteria for the position was that the applicant have "Grantsmanship," meaning that the applicant brought in money through grants to pay a portion of his or her salary, as well as money for hiring post-doctoral candidates or research assistants. Another criteria was that the applicant have published at least three peer-reviewed articles within each of the ten preceding years. Defendant asserts that Plaintiff met neither of these requirements. Plaintiff claims the requirements "were crafted by Dr. Kolison with no input from scientists to ensure fairness" and that she would have met the requirements if the "evaluation system had been fair." (Pf. Aff. ¶ 15).

The final decision of whether an applicant is granted a requested reclassification lies with the Vice President of faculty and affairs, Dr. Augustus Bankhead ("Dr. Bankhead"), to whom Dr. Kolison reported. Dr. Kolison could only make a recommendation regarding reclassification, and did not have the power to fire, demote, promote or transfer Plaintiff or other faculty members. Nevertheless, Plaintiff claims that Dr. Bankhead followed Dr. Kolison's recommendations.

_____

[3]Plaintiff had previously been an Associate Professor at another college.

The panel that reviewed Plaintiff's application for full Research Professor in 2002 denied Plaintiff the promotion because a majority of the panel believed Plaintiff did not meet the required qualifications. Based on the panel's conclusion regarding Plaintiff's application for reclassification, Dr. Kolison did not recommend to Dr. Bankhead that Plaintiff be reclassified to full Research Professor.

Despite being allowed only one application per year and being denied the full Research Professor position, Plaintiff was nonetheless reclassified to the position of Associate Professor in January 2003, retroactive to October 2002. This was the result of Dr. Kolison's recommendation to Dr. Bankhead, the Vice President, that Plaintiff be reclassified to Associate Professor with an increased salary effective October 2002.

In 2004, Plaintiff again applied for reclassification to full Research Professor. Plaintiff was aware of the criteria required to qualify for full Research Professor prior to making her application in 2004. She knew that she had to meet fully eight of the qualification requirements, and also that she needed to meet the Grantsmanship requirement and the refereed journal requirement. As before, the application was sent to a panel of reviewers to determine whether the applicant was qualified. The panel was of the view that Plaintiff did not meet the refereed journal requirement or the Grantsmanship requirement and accordingly did not recommend Plaintiff for the position of full Research Professor. Plaintiff and two other applicants appealed the panel's decision which denied each of them the rank of full Research Professor.

In 2006, Plaintiff again applied for the rank of full Research Professor. Plaintiff met the qualifications for the position and was reclassified to full Research Professor in 2006.

6

Plaintiff filed a sexual harassment complaint against Dr. Kolison on March 4, 2004, utilizing Defendant's internal equal opportunity procedures. The complaint was wide-ranging and asserted various allegations against Dr. Kolison, primarily that after she slept with him on two occasions, Dr. Kolison retaliated against her in assorted ways when she no longer acquiesced to his advances. Dr. Kolison claims he never had sexual relations with Plaintiff. The complaint was investigated, several witnesses were interviewed, and a lengthy opinion listing findings and conclusions was prepared in which the investigating officer found no basis for the allegations of harassment.

Up to this point, the facts appear to be relatively straight-forward. Defendant then sets forth various other facts, apparently in an effort to address the scatter-shot approach Plaintiff has taken in asserting claims in this action. These facts include the following.

Plaintiff contacted Mario Keri ("Keri")[4] in Canada and invited him to join the staff at TSU. Plaintiff submitted an appointment recommendation for Keri to her immediate supervisor, Dr. Nick Gawel, ("Gawel") who in turn sent it to Dr. Kolison for approval. While Dr. Kolison approved the appointment, Plaintiff claims that the appointment came about after Dr. Kolison created an unreasonably short period of time for hiring, and after he eliminated two applicants from consideration. Plaintiff claims that she had no choice in hiring Keri because of those actions by Dr. Kolison.

At some point around 2000, Plaintiff expressed some interest in attending leadership training courses. Plaintiff did not know whether there was a leadership training program available or

_____

[4]The parties do not indicate in their summary judgment papers what position Keri may have had at the time of his selection, or what position he took when he arrived at TSU.

scheduled in 2001. Dr. Kolison sent a memo to Dr. Gawel informing him Plaintiff would be attending leadership training.

Leadership training institutes are not regularly scheduled. Some applicants apply a year or two before being able to actually attend a training program. Dr. Kolison inquired as to when the next class would start and nominated Plaintiff and another staff member for the leadership training program. Plaintiff graduated from the leadership training program on March 5, 2003.

Plaintiff and Dr. Ekanem (who apparently is another professor in Plaintiff's department) requested approval for financial assistance for international travel[5] to a foreign country to conduct sponsored research. Subsequently, other scientists, including Drs. Safdar and Dushaja, made similar requests but were denied the opportunity because of insufficient funds for travel, causing them to complain. In an effort to ensure that all had an equal opportunity, Dr. Kolison required that all future requests for such travel be submitted to him for review and approval. If Dr. Kolison agreed with the premise provided in support of the request, Dr. Kolison utilized available funds, and when funds were not available, he sent a letter to sponsors seeking support for the program. (Kolison Dep., p. 45).

Dr. Kolison has the discretion to appoint staff members to various committees. Plaintiff claims Dr. Kolison refused to appoint her to committees in 2005 because he claimed she was not showing sufficient enthusiasm. While Defendant claims Plaintiff was voted off the seminar committee for erratic attendance, Plaintiff claims that is untrue. In any event, Plaintiff was appointed to the safety committee by Dr. Kolison in January 2006. It is undisputed that this is a very critical committee at the facility in McMinnville because it deals with safety compliance issues.

---

[5] Defendant asserts that both received funding, although Plaintiff's Affidavit clouds that issue.

8

For her part, Plaintiff states that the following "are what Plaintiff believes to be the pertinent facts of this case which show that her claims of discrimination and retaliation are viable":

1. Plaintiff slept with Kolison in 2002 because he made it clear that was the only way I would get leadership training. (P. dep. Pg 23).

2. I felt coerced to do so. (P. dep. Pg 24).

3. He told me I could "serve as his wife" on a trip out of town. (P. dep. Pg 15)

4. I became depressed after that. (P. dep. Pg 27).

5. After having sex with Kolison again in February 2002, I refused any further advances. (P. dep. Pg 38)

6. After I was not recommended by a panel for a full professorship, Kolison recommended I appeal. (P. dep. Pg 82).

7. Pending the result of my appeal Kolison made it clear that I would have to sleep with him to get an answer on my appeal. (P. dep Pg 82).

8. In July 2002 Kolison asked me to sleep with him and I refused. (P dep Pg 83).

9. I found out later that Kolison was responsible for there being no approval of my appeal.

10. He had told Dr. Bankhead that I had refused the position. (P dep. Pg 89).

11. Following my refusal of his requests for sex, Kolison refused to request an increase in my pay. (P dep. Pg 104).

12. Kolison later denied my request to transfer to the Plant team for no justifiable reason.(P. depo. Pg 121-122).

13. A rule was enacted, which only applied to me, although it appeared to be a blanket rule. (P. dep. Pg 123).

14. Prior to January, 2005, I had filed a complaint against Kolison with TSU EEO which was not fairly dealt with. (P. dep. Pg 125-129).

15. I filed EEOC complaint in January 2005 alleging sexual harassment. (P dep Pg. 124).

9

16. I received my Right to Sue letter from the EEOC in August, 2006. I filed my lawsuit in November 2006.

17. Kolison retaliated against me for refusing him sexual favors by refusing my request to transfer from environmental to plant team. He forced me to accept an incompetent as my assistant by limiting the field of candidates from which my assistant had to be chosen. (P dep Pg 145-146).

18. Kolison refused to appoint me to committees. (P dep Pg 151).

19. I had been on several committees before I refused sexual relations. (P dep Pg 152).

20. He removed me from the seminar committee for several absences – the same behavior as other members of the committee who were not removed. (P. dep Pg 155-157).

21. I was removed from all committees in 2005 by Kolison because, he said, I was not sufficiently enthusiastic. (P dep 159-160).

22. Kolison appointed all who served on committees. (P dep Pg 160).

23. Kolison wouldn't allow anyone who worked for me to be on committee. (P dep Pg 165).  He was quoted as saying that he deliberately left my assistants off of committees and teams. (P dep Pg 166).

24. He later removed the Post-Docs (Associates) from teams rather than put mine on. (P. depo Pg. 168).

25. My Post-Doc MREMA was not allowed to apply for grants while other Post-Docs were. (P. depo Pg. 177).

26. Kolison took away my power to use and move grant funds. (P. depo Pg. 178).

27. My name was not even listed as a person who has grants – and I have several. (P. depo Pg. 180).

28. This occurred after I filed my EEOC claim. (P. depo Pg 182).

29. Mr. Gawel and Ms. Martin were assigned to "supervise" me in my duties on the search committee – others were not so "supervised". (P depo Pg. 190-191).

30. All of the above started after I complained about Kolison's sexual harassment. (P. depo Pg. 192).

10

31. Gawel blocked my committee's interview of prospective interviewees, which had been chosen by my committee. (P depo Pg. 6-8).

32. The hiring (of an assistant) was delayed at every stage. (P. depo Pg. 200, Lns 21-24).

33. Even after I gave Gawel the requested information, he continued to ask for more. (Pg 205, Ln 15-20). I was being harassed. (Pg. 206, Ln 6-8).

34. I am still being harassed through negative Memos about everything I do. (Pg. 207, 208, Lns. 1-25).

35. Kolison wouldn't approve me to go on a research mission to Africa as Retaliation. (Pg. 212, Lns 3-6). Even though the loss of my time would have been made up for in other ways. (Pg. 216, Lns. 15-20).

36. Kolison was retaliating which is proven by the fact that he was always pushing for international collaboration – except in my case. (Pg. 217, Ln. 16-21). He did say I could take annual leave and go but then I would receive nothing for supplies and materials or students support. (Pg. 220, Ln. 12-19). I wouldn't get credit for that. (Pg. 221, Ln. 1).

37. I was required to justify my request that an incompetent employee be fired. (Pg. 241, Ln. 11).

38. Kolison and Gawel sided with the employee. (Pg. 242, Ln. 18-25).

39. Being forced to use that employee affected my work performance and my personnel record. (Pg. 244, Ln. 1-25) as well as my reputation. (Pg. 246, Ln. 1-10).

40. Dr. Sauve felt that Kolison harassed him because of Kolison's belief that Sauve had encouraged Mmbaga to file harassment claim. (Sauve depo. Pg. 13).

41. Mmbaga told him that Kolison "might" be sexually harassing her. (Sauve depo. Pg. 22).

42. Kolison admitted that "Lydia", another defendant employee that worked with him, had filed a sexual discrimination claim against him. (Kolison Depo, Pg. 27).

43. Kolison says he did not approve hiring Keri. (Kolison Depo., Pg. 29). Then turned right around and said he did approve hiring Keri. (Kolison Depo., Pg. 30).

(Docket Entry No. 44 at 2-5).

11

Obviously, many of these facts are conclusory and, although Plaintiff cites her deposition testimony, she does not provide the cited portions for this Court's review. Further, the mere listing of purported facts does not place them in context and, in that regard, are unhelpful to the Court in its analysis. Additionally, many of the purported facts are not addressed in Plaintiff's arguments and thus it is unclear which facts purportedly help to establish which claim.

### III. <u>STANDARD OF REVIEW</u>

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. <u>See</u> <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986); <u>Covington</u>, 205 F.3d at 914 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. <u>Celotex</u>, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence

12

in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.  APPLICATION OF LAW

Plaintiff filed suit alleging that she had been subjected to discrimination and harassment based on race, sex, and national origin.  She also claims that she was subjected to retaliation. Plaintiff sued TSU under Title VII, 42 U.S.C. § 2000e-5(f)(1), 42 U.S.C. § 1981, and the Tennessee Human Rights Act ("THRA"), T.C.A. § 4-21-311(d).  Plaintiff's claims under 42 U.S.C. § 1981 and the THRA were dismissed by Order of the Court, as was her Title VII claim for race discrimination (Docket Entry No. 32).  Subsequently, the parties voluntarily stipulated to the dismissal of Plaintiff's national origin claim (Docket Entry No. 33), leaving her claims of sex discrimination and retaliation under Title VII.  Prior to reaching those remaining claims, the Court will address Defendant's contention that Plaintiff's charges before the EEOC were untimely, as was the Complaint filed in this Court.

### A.  Timeliness

Defendant first asserts that Plaintiff did not timely file her charge of discrimination with the EEOC.  Plaintiff has not responded to this argument.

Under Title VII, in a deferral state such as Tennessee, a claimant must file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") within three hundred days of a discrete act of discrimination.  Tartt v. City of Clarksville, 149 Fed. Appx. 456, 460 (6th Cir. 2005).[6]  However, the three-hundred day limitation period applies to discrete act and

---

[6]"While the 300-day bar is not jurisdictional, it does have the effect of a statute of limitations, and is not to be waived without good cause."  Id.

13

not those of a continuing nature, such as harassment.   National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002).  The "continuing violation theory" applies where there is "some evidence of *present* discriminatory activity" and evidence of "'a long-standing and demonstrable policy of discrimination.'"   Wheaton v. North Oakland Med. Ctr., 130 Fed. Appx. 773, 787 (6th Cir. 2005)(emphasis in original) citing, Dixon v. Anderson, 928 F.2d 212, 217 (6th Cir. 1991).

Here, when the facts are considered in Plaintiff's favor, Plaintiff alleges a continuing violation.  She claims that she continues to be left off committee assignments and further that she is repeatedly and unfairly criticized.  She also asserts that Dr. Kolison has engaged in a long-standing pattern of discriminatory practices, dating back to as early as 2002.  Hence, the Court cannot conclude that Plaintiff's claims are barred by her failure to file charges with the EEOC within the limitations period.

Defendant also asserts that Plaintiff's Complaint in this Court  is untimely because it was filed 95 days after issuance of a Notice of Right to Sue from the EEOC.   Again, Plaintiff did not respond to this argument.

 "A Title VII plaintiff ordinarily must file a civil action within ninety days of receiving a notice of dismissal and right to sue from the Equal Employment Opportunity Commission."  Seay v. Tennessee Valley Authority, 339 F.3d 454, 469 (6th Cir. 2003).  Like the limitations period for filing a charge with the EEOC, the 90-day period for filing a lawsuit is not jurisdictional.  Mitchell v. Chapman, 343 F.3d 811, 819-20 (6th Cir. 2006).

Defendant claims that 95 days elapsed between the time the EEOC issued a Notice of Right to Sue on July 31, 2006 and the filing of Plaintiff's suit on November 1, 2006. However, Title VII's ninety-day requirement begins to run upon receipt of the Notice, 42 U.S.C. § 2000e-5(f)(1), and

14

Plaintiff claims she did not receive the July 31, 2006 Notice until some time in August 2006. Regardless, "[t]he Sixth Circuit has resolved" that "the ninety-day limitations term begins running on the fifth day following the EEOC's mailing of [the Notice of Right to Sue] to the claimant's record residential address, by virtue of a presumptions of actual delivery, and receipt within that five-day duration[.]" Graham Humphreys v. Memphis Brooks Museum of Art, 209 F.3d 552, 557 (6th Cir. 2000). Here, the presumption employed by the Sixth Circuit means that Plaintiff had imputed receipt of the Notice on August 5, 2006, meaning that she needed to file suit by November 3, 2006 which she did. Accordingly, her claims will not be dismissed as being untimely filed in this Court.

**B. Sex Discrimination**

In regard to her sexual discrimination claim, Plaintiff argues that "the facts present an obvious case of quid pro quo sex discrimination." (Docket Entry No. 44 at 7). Specifically, Plaintiff claims that "the only way she could get leadership training would be to have sex with Dr. Kolison" and that "[s]he felt as if she had no other choice." (Id.). Plaintiff also claims that it was made clear to her that in order to get an answer regarding her appeal of the denial of her reclassification (although it is not made clear when) Plaintiff felt she had to sleep with Dr. Kolison.

Title VII prohibits discrimination "against any individual with respect to [her] compensation, terms, conditions or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000 e-2(a)(1). One of the ways in which the Title VII prohibition against sex discrimination may be violated is through sexual harassment. See, Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998).

To prove sexual discrimination or harassment of the "quid pro quo" variety,[7] Plaintiff must show (1) that she is a member of a protected class; (2) that she was subjected to unwelcome sexual advances or requests for sexual favor; (3) that the harassment was on the basis of sex; (4) that her refusal to submit to the unwelcome demands resulted in an adverse employment action; and (5) that liability may be imputed to the employer." Bowman v. Shawnee State Univ., 220 F.3d 456, 461 (6th Cir. 2001). With regard to the last element, "[a]n employer's liability for supervisory sexual harassment depends on the consequences of the supervisor's actions. If proven sexual harassment by the supervisor did not result in a tangible employment action, then the employer may not be liable if it engaged in preventative or corrective measures and the plaintiff unreasonably failed to utilize the measures the employer provided." Keeton v. Flying J, Inc, 429 F.3d 259, 262-263 (6th Cir. 2005), citing, Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). If the sexual harassment resulted in a tangible employment action, the employer will be strictly liable for the supervisor's sexual harassment, because tangible employment actions which occur as a result of a refusal to submit to a supervisor's sexual demand "itself constitutes a change in the terms and conditions of employment[.]" Ellerth, 524 U.S. at 762-63.

Under the Supreme Court's decision in Ellerth, a tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at

---

[7]The Court notes that since the Supreme Court's decisions in Ellerth and Faragher (cited below), "the concept of quid pro quo harassment has largely been abandoned; courts instead distinguish between cases in which the plaintiff suffered a tangible employment action and those in which no such action was taken. Godin v. Whirlpool Corp., 132 Fed. Appx. 661, 664 (7th Cir. 2005).

761.  The Sixth Circuit interprets this to mean "that an employment action must be materially adverse for an employer to be strictly liable for sexual harassment." <u>Keeton</u>, 429 F.3d at 263, citing <u>Kocsis v. Multi-Care Mgmt. Inc.</u>, 97 F.3d 876, 886 (6th Cir.1996).

In this case, even if the Court accepts for purposes of summary judgment Plaintiff's assertion that Dr. Kolison had sexual relations with her and that he continued to make demands for such favors, Plaintiff has failed to show that she was subjected to a tangible employment action or a materially adverse action.  As indicated, in her response brief, Plaintiff points to the alleged delay in her being provided leadership training and the delay in the resolution of her appeal relating to reclassification to full Research Professor as tangible employment actions.

Plaintiff complains that Dr. Kolison somehow thwarted her efforts to attend leadership training.  However, she does not present any evidence as to when those programs were held and whether she was qualified to attend.  Indeed, the undisputed evidence shows that leadership training programs are not scheduled regularly and there is a procedure which the employee must follow before the applicant can attend the program.  In fact, it is not uncommon for an applicant to apply and then wait a year or two to attend the program.  Here, after Dr. Gawel approved Plaintiff's request to attend leadership training, Dr. Kolison nominated Plaintiff and another staff member to attend the next leadership training program.  Plaintiff attended and graduated from the program in March 2003.

The Supreme Court in <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 126 S.Ct. 2405, 2416  (2006) indicated that depriving an employee of a training opportunity could be a materially adverse action, at least where such training "contributes significantly to the employee's professional advancement."  Though "leadership training" sounds important, the Court has no way of knowing

17

what such training entails and whether it would be of benefit to Plaintiff in terms of her professional advancement. To establish a tangible employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id.; see, Lutkewitte v. Gonzales, 436 F.3d 248, 253 (D.C. Cir. 2006)(no tangible employment action within meaning of Faragher and Ellerth where there is no evidence that denial of employee's activity constituted an important step for promotion); Johnson v. United Parcel Service, Inc., 117 Fed.Appx. 333, 450 (6th Cir. 2004)(allegation that delivery employee was not trained on certain routes does not meet materially adverse requirements); Washington v. American Drug Stores, Inc., 119 Fed. Appx. 3, 4 (7th Cir. 2004)(refusing to allow plaintiff to attend training for "improving supervisor performance" not tangible employment action). Given the dearth of evidence on this issue, the Court would have to speculate that a reasonable employee would have found delay in attending leadership training materially adverse. However, it is incumbent upon Plaintiff to establish her claim in order to survive summary judgment.

Plaintiff also claims that Dr. Kolison thwarted her promotion prospects. In particular, Plaintiff alleges that when her initial request for reclassification was denied, Dr. Kolison suggested to Plaintiff that if she slept with him, he would speed along the appeals process.

Unquestionably, the denial of a promotion constitutes a tangible employment action. Bacon v. Honda of America Mfg., Inc., 192 Fed. Appx. 337, 343 (6th Cir. 2006). However, for there to be quid pro quo harassment in the denial of a promotion based upon the refusal of sexual advances, a plaintiff must show that she was qualified for the position and that such a position was available. Jackson v. County of Racine, 474 F.3d 493, 501 (7th Cir. 2007); Frederick v. Sprint/United Mgt. Co.,

18

246 F.3d 1305, 1312 (11th Cir. 2001). In this case, as will be explained in more detail in the following section, Plaintiff does not produce evidence that she was qualified for the position of full Research Professor when she sought reclassification in 2002 and again in 2004.

Moreover, Plaintiff has presented no evidence that Dr. Kolison had any ability to influence if and when Dr. Bankhead would resolve an appeal. While Plaintiff appears to be claiming that Dr. Kolison's motive in not intervening on her behalf was because she did not continue to sleep with him, "motive . . . does not prove that [Dr. Kolison's] sexual harassment prevented her from receiving the position." <u>Idusuyi v. State of Tennessee Dept. of Children's Servs.</u>, 30 Fed. Appx. 398, 401 (6th Cir. 2002). The Sixth Circuit has held that in the context of <u>Faragher</u>/<u>Ellerth</u> liability that "discriminatory animus on the part of a supervisor cannot be imputed to the supervisor's supervisor but that plaintiff[] had to show evidence that discriminatory motives influenced 'the ultimate decision-makers.'" <u>Id</u>. citing, <u>Wilson v. Stroh, Co.</u>, 952 F.2d 942, 946 (6th Cir. 1992). Plaintiff has provided no evidence to support such a contention. <u>See</u>, <u>Russell v. University of Texas of Permian Basin</u>, 234 Fed.Appx. 195, 202-203 (5th Cir. 2007)(university professor's quid pro quo harassment claim failed where decision was initially made by search committee and later approved by committee members and where plaintiff "presented no competent summary judgment evidence that her alleged harasser was responsible for the decision not to hire her.")

Without a showing of a tangible employment action, Defendant still could be liable unless it establishes the <u>Ellerth</u>-<u>Faragher</u> affirmative defense. To avail itself of this defense, defendant must show "(a) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) that Plaintiff unreasonably failed to take advantage of any preventive or corrective

19

opportunities provided by the employer or to avoid harm otherwise." Deters v. Rock-Tenn. Co., Inc., 2007 WL 2404515 at *8.

"Generally, an employer satisfies the first element of this two-part standard when it has promulgated and enforced a sexual harassment policy." Id. citing, Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. While there is no exact formula for assessing a given sexual harassment policy, the Sixth Circuit has indicated that "an effective harassment policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy." Clark v. United Parcel Service, Inc., 400 F.3d 341, 349-50 (6th Cir.2005) (citations omitted). The existence of such a policy is "strong evidence that the employer took sufficient general measures to prevent harassment." Collette v. Stein-Mart, Inc., 126 Fed. Appx. 678, 685 (6th Cir. 2005)(emphasis in original).

In this case, Defendant has an "Affirmative Action and Equal Opportunity" policy which covers claims of sexual harassment. That policy is widely disseminated and requires the prompt reporting of conduct which could be in violation of the policy. Complaints, which are generally expected to be in writing, are made to the Equal Opportunity/Affirmative Action Officer and where the claim is against that Officer the claim is referred to another individual qualified to investigate the complaint. Under the policy, the Affirmative Action Officer is to make a general presentation regarding the policy at least once every two years to the faculty and staff and is to conduct workshops regarding the policy for departmental units.

20

Given the existence of an effective harassment policy, Plaintiff has the burden of showing that Defendant failed to take prompt and effective corrective action once it learned of alleged workplace harassment. Rudd v. Shelby County, 166 Fed. Appx. 777, 778 (6th Cir. 2006). "'The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified.'" Collette v. Stein-Mart, Inc., 125 Fed. Appx. 678, 686 (6th Cir. 2005)(citation omitted). "By doing so, 'the employer puts all employees on notice that it takes such allegations seriously and will not tolerate harassment in the workplace.'" Id.

In this case, the facts show that the sexual harassment policy implemented by Defendant was not a hollow gesture. When Plaintiff filed a complaint of sexual harassment by Dr. Kolison, it was investigated thoroughly, several individuals were interviewed, and a lengthy report was issued. (Docket Entry No. 37-1at 69). While the ultimate conclusion was no finding of harassment, this does not mean that the policy coupled with prompt investigation was not an effective deterrent since presumably not every claim of harassment, sexual or otherwise, is going to be verified as having occurred.

In order to satisfy the second element of the Ellerth-Faragher affirmative defense, it must be shown that Plaintiff "'unreasonably failed to take advantage of any preventative or corrective opportunities provided by the [Defendant] or to avoid harm otherwise.'" Faragher, 118 S.Ct. at 2293. Though "proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the

employer's burden under the second element of the defense." Ellerth, 524 U.S. at 765, 118 S.Ct. 2275.

In this case, the only evidence which has been supplied to the Court in the summary judgment record is that Plaintiff filed her internal charge in 2004, alleging discrimination dating as far back as 1999 yet she now complains of events which encompass not only those allegations, but also allegations of harassment up to the present. This does not show that Plaintiff used due care to avoid harm by promptly utilizing the remedial measures provided by her employer. Ellerth and Faragher impose a prompt reporting duty. Delay in complaining for several months does not present an issue for the trier of fact as to whether the employer acted reasonably to correct harassing behavior. See, Miniz v. Jeld-Wen, Inc., 2007 WL 1828259 at *6 (11th Cir. 2007)(summary judgment proper where employees waited to complain between four and sixth months); Jackson v. County of Racine, 474 F.3d 493, 501 (7th Cir. 2007)(not complaining or waiting four months to complain entitles employer to summary judgment); Williams v. Missouri Dept. of Mental Health, 407 F.3d 972, 976 (8th Cir. 2005)(summary judgment appropriate where employee waited four months to complain).

In sum, Defendant is entitled to summary judgment on Plaintiff's sex discrimination claim because Plaintiff has failed to establish a material adverse action and because the Defendant has established the Ellerth-Faragher affirmative defense.

**C. Retaliation**

The general framework for analyzing a retaliation case is as follows. Plaintiff must establish a *prima facie* case of retaliation by showing: (1) she engaged in protected activity; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action

22

against her; and (4) there was a causal connection between the protected activity and the adverse employment action. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 791 (6th Cir. 2000)(emphasis omitted). "If and when a plaintiff has established a *prima facie* case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." Id. at 792-93 (citation omitted). "The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" Id. at 793 (citation omitted).

In her response, Plaintiff sets forth a laundry list of actions which she says were taken in retaliation for her having filed an internal charge of sexual harassment. Many of these are set forth without any dates, making it difficult to tell if the actions occurred prior to Plaintiff's filing of her internal charge. The absence of dates also makes it hard to know if there was some temporal relationship between the complained of action and Plaintiff's internal charge of sexual harassment, which would provide indirect evidence of retaliatory intent. See, DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004). These would include Plaintiff's contention that "following her refusal of [Dr. Kolison's] requests for sex, [Dr. Kolison] refused to request an increase in her pay" and "refus[ed] her request to transfer from environmental to plant team." (Docket Entry No. 44 at 8). It would also include Plaintiff's contention that she was forced to hire an incompetent assistant, and that her assistants were not allowed to apply for grants.

Some of these same alleged acts of retaliation, and others, have not been shown to be "materially adverse." Under Burlington Northern, 126 S.Ct. at 2415, to be an "adverse employment action" it is not necessary that the action be some sort of "ultimate employment decision," such as hiring, granting leave, discharging, or demoting. Instead, as previously noted,

23

"a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (citations and quotation marks omitted). It is imperative that the action be materially adverse, because it "is important to separate significant from trivial harm." Id. Hence in Burlington Northern retaliation in the form of suspension for thirty-seven days without pay was material because a reasonable worker would be dissuaded from making a discrimination claim if she thought it would result in a loss of pay.

Some of the acts about which Plaintiff complains hardly rise to this level or have not been shown to rise to this level. Plaintiff simply has not shown that being allegedly forced to hire an "incompetent assistant" by virtue of the limited time frame allowed for hiring, being supervised while on a search committee, having associates taken off of other faculty member's teams, disallowing her employees to be on committees, and receiving unspecified negative memos constitutes a materially adverse action.

The gravamen of Plaintiff's retaliation complaint appears to relate to Defendant's failure to promote her to full Research Professor until 2006 and Dr. Kolison's alleged refusal to assign her to committees or allowing her to go on a research mission to Africa. Plaintiff has failed to present a jury issue necessitating a trial on any of these allegations.

Plaintiff's complaint relating to her being promoted to a full professorship appears to be that after the panel did not recommend her for such a position, Dr. Kolison told her to appeal and that, pending the result of her appeal, Plaintiff would have to sleep with him to get an answer on her appeal. Plaintiff has presented absolutely no evidence that Dr. Kolison could somehow affect the resolution of an appeal to Dr. Bankhead. Plaintiff has not shown a causal connection between

24

Dr. Kolison's comments and her not receiving a full professorship until 2006, nor has she rebutted the Defendant's legitimate non-discriminatory reason for Plaintiff not being promoted.

Defendant asserts that, for several reasons, Plaintiff did not meet the qualifications for a full professorship before 2006, including that she did not have the requisite Grantsmanship and requisite number of peer-reviewed publications. Indisputably, these were requirements for the position of full professorship and thus Defendant has articulated a legitimate non-discriminatory reason for non-promotion. See, Williams v. Columbus Metro. Housing Auth., 80 Fed Appx. 870, 873 (6th Cir. 2004)(hiring qualified candidates is legitimate, non-discriminatory reason).

In order to survive summary judgment, Plaintiff must show that the proffered reason is pretextual. She may do so by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. Dew v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000). Plaintiff has demonstrated none of these things.

Plaintiff merely alleges, in conclusory fashion, that the requirements were too onerous and that, even so, in her view, she met the requirements. However, Plaintiff's own beliefs about her qualifications is insufficient to call into question the Defendant's business judgment about her relative abilities and experience. Felder v. Nortel Networks Corp., 187 Fed. Appx. 586, 594 (6th Cir. 2006); Wrenn v. Gould, 808 F.2d 493, 502 (6th Cir. 1987). This is particularly true in the academic arena as courts are reluctant to "second guess the expert decisions of faculty committees" because for such positions "the department must believe the candidate has a certain amount of promise." Sun v. Board of Trustees of Univ. of Illinois, 473 F.3d 799, 815 (7th Cir. 2007).

25

Plaintiff also claims that she was retaliated against by Dr. Kolison in relation to committee assignments. She again makes broad-ranging and conclusory assertions in relation to this contention. She claims that she was removed from the seminar committee allegedly because she had too many absences. She also claims that Dr. Kolison refused to appoint her to committees although, before the alleged harassment, she had been on several committees. Plaintiff has provided insufficient proof to establish this claim.

Depending upon the facts of a case, failing to assign or removing one from a committee or a particular team may or may not constitute an adverse employment action. See, Aquilino v. University of Kansas, 268 F.3d 930, 934 (10th Cir. 2001); Whitcomb v. First Am. Nationwide Documents, 2006 WL 218016 at * 6 (D. Colo. 2006); Ruggieri v. Harrington, 146 F.Supp.2d 202, 217 (E.D.N.Y. 2001). Plaintiff does not even suggest how not being on a given committee could have an adverse affect on her.

Yet even if it is assumed that removal from, or not being placed on, a committee constituted an adverse action, Plaintiff's claim fails because she has not shown a causal connection between her refusal to accept Dr. Kolison's entreaties and her placement on or removal from a committee. To establish her retaliation claim, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). This may be done by showing Defendant treated Plaintiff differently from similarly situated employees. Harris v. Giant Eagle, Inc., 133 Fed. Appx. 288, 293 (6th Cir. 2005)

Plaintiff appears to be claiming dissimilar treatment because she was removed from the seminar committee purportedly for excessive absenteeism, while others were not. However, to rebut

26

a proffered reason for an action by attempting to show others were treated differently, it is incumbent upon Plaintiff to show that the comparator was similar in all relevant respects. See, Weigel v. Baptist Hosp. of East Tennessee, 302 F.3d 367, 378 (6th Cir. 2002). While "[e]xact correlation is not required," in order to show similarity plaintiff must identify another who engaged in similar conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Smith v. Leggett Wire Co., 220 F.3d 752, 762 (6th Cir. 2000). Simply saying that others also had absences is not enough.

Apart from removal from the seminar committee, Plaintiff also complains that Dr. Kolison refused to appoint her to other committees. However, here again Plaintiff's claim is conclusory. The Court has no way of knowing what committees Plaintiff sought to be on, how the selection process occurred, what criteria was utilized in selection, and even whether Plaintiff was qualified to be on any given committee.

In her response brief, and without any further amplification, Plaintiff also claims that Dr. Kolison refused to "approve Plaintiff to go on a research mission to Africa as retaliation." (Docket Entry No. 44 at 5). Plaintiff's claim in this regard is not made any clearer by her deposition testimony in the record,[8] or by her Affidavit. In her deposition, Plaintiff claims that Dr. Kolison refused her request to go on a research mission to Africa because the university would have to pay her salary for the ten days she was there, and because her research role was not sufficiently defined. (Pf. Depo. at 220-21). Plaintiff also claimed that the real reason was "just retaliation." (Id. at 217). In her Affidavit, Plaintiff conclusorily asserts that "Dr. Ekanem" was allowed to attend a conference

---

[8] Unlike Plaintiff, Defendant supplied relevant portions of Plaintiff's deposition testimony.

27

in Australia more than a year before Plaintiff's request but that a new rule was enacted after Plaintiff made her request that required everyone to request permission from Dr. Kolison. (Pf. Aff. ¶ 38).

Absent anything else, not allowing an employee to travel abroad because the university would be responsible for paying that employee's salary and because the research proposal was not sufficiently defined appear to be legitimate non-discriminatory reasons for not allowing the travel. Merely asserting that the real reason is retaliation does not make it otherwise. Further, while another professor may have been allowed to travel previously does not mean that the denial of Plaintiff's request was in retaliation for having complained. The Court does not know any of the particulars of Dr. Ekanem's travel, the length of his journey, the purpose of the journey, or whether Dr. Ekanem was allowed to maintain his salary when he was abroad. As such, Plaintiff has not shown that she was similarly situated to Dr. Ekanem, let alone anyone else.

Moreover, Dr. Kolison testified in his deposition that after he wrote letters requesting funding on behalf of Dr. Ekanem and Plaintiff, other faculty members became upset and wanted funding for international travel. In order to make it fair to all, Dr. Kolison required that all of the faculty members submit such requests to him so that each would receive consideration by the same person for their request. Plaintiff has simply provided no evidence that this is untrue and therefore pretextual.

Where Plaintiff claims she was subjected to an adverse action, the "key inquiry" becomes "whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" Braithwaite v. Timken Co., 248 F.3d 488, 494 (6th Cir. 2001). If the employer presents facts that indicate it made a "reasonably informed and considered decision' that demonstrates an 'honest belief' in the proffered employment action," Plaintiff must offer proof that

28

suggests that the stated reason was a lie or not the real reason, Id.; see, Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006)(discussing modified "honest-belief rule" utilized by the Sixth Circuit. Even accepting what Plaintiff says were the reasons Dr. Kolison refused her request for international travel, she has offered no proof that funding was available or regularly utilized for that purpose, nor has she shown that her request was in such a form that it should have been approved.

Plaintiff has failed to establish a prima facie case of retaliation with respect to many of her allegations. Where Plaintiff has set forth sufficient facts to establish a prima facie case, Defendant has articulated legitimate non-discriminatory reasons for its actions which Plaintiff has not shown to be pretextual. As such, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

**D. Summary**

Unquestionably, Plaintiff believes that she was subjected to discrimination and retaliation at the hands of Dr. Kolison and/or TSU. However, subjective beliefs about mistreatment in employment are insufficient to survive summary judgment. See, Giles v. Norman Noble, Inc., 88 Fed.Appx. 890, 894 (6th Cir. 2004); Hibbler v. Regional Med. Ctr., 12 Fed.Appx. 336, 339 (6th Cir. 2001); Mitchell v. Toledo Hospital, 964 F.3d 577, 585 (6th Cir. 1992). Instead, the Plaintiff is required to submit competent evidence in support of her claims which shows that there are disputed factual issues requiring resolution by a jury and this Court is not required to scour the record to determine whether genuine issues of fact exist. Young v. City of Cleveland, 2000 WL 924590, *2 (6th Cir. 2000). "Rather, the trial court may rely on the 'facts presented and designated'" id. quoting, Guarino v. Brookfield Township Trustees, 980 F.2d 399, 404 (6th Cir.1992), and those designated

Case 3:06-cv-01073   Document 49   Filed 11/20/07   Page 29 of 30 PageID #: 419

and supported facts show that Defendant is entitled to summary judgment on Plaintiff's claims of sex discrimination and retaliation.

## IV.  CONCLUSION

On the basis of the foregoing, Defendant Tennessee State University's Motion for Summary Judgment (Docket Entry No. 34) will be granted.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

Case 3:06-cv-01073   Document 49   Filed 11/20/07   Page 30 of 30 PageID #: 420